UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------x
FRANK IANNUCCI,                              :

                Plaintiff,       :

        - against -                        :

THE SEGAL COMPANY, INC.                      :

                          :

                Defendant.
------------------------------------------------------x
THE SEGAL COMPANY, INC.                      :

             Third-Party Plaintiff,   :

        - against -                        :

SUMMIT ACTUARIAL SERVICES,                   :
and FIRST ACTUARIAL
CONSULTING TEAM, LLC                         :

          Third-Party Defendants.    :
------------------------------------------------------x

**USDC SDNY**
**DOCUMENT**
**ELECTRONICALLY FILED**
DOC #: _____
DATE FILED: 6/26/06

## OPINION AND ORDER

06 Civ. 4720 (PKL)

### APPEARANCES

INGRAM YUZEK GAINEN CARROLL & BERTOLOTTI, LLP
250 Park Avenue
New York, New York 10177
David G. Ebert, Esq.

Attorneys for Plaintiff and Third-Party Defendants

SEYFARTH SHAW LLP
1270 Avenue of the Americas, Suite 2500
New York, New York 10020-1801
James S. Yu, Esq.

Attorneys for Defendant and Third-Party Plaintiff

**LEISURE, District Judge:**

Plaintiff Frank Iannucci, a resident of New Jersey, filed his complaint in this action on June 20, 2006, against his former employer, The Segal Company, Inc. ("Segal"), a New York actuarial and consulting firm that advises various business entities on their employee benefit plans. Plaintiff's complaint seeks, *inter alia*,[1] a declaratory judgment that his employment agreement with defendant, dated June 1, 1998 ("Agreement"), and the restrictive covenant contained therein, is invalid and unenforceable. Counsel for both parties jointly contacted this Court's chambers later that same day to inform the Court that defendant intended to, in addition to filing its answer, move the Court, by way of an order to show cause, for a temporary restraining order and preliminary injunction enjoining plaintiff from violating the restrictive covenant set forth in the Agreement. On June 21, 2006, after hearing preliminary arguments from the parties, and after preliminarily reviewing the parties' documentary submissions, the Court informed the parties that it would grant defendant's request for a temporary restraining order pending a preliminary injunction hearing at which time the Court can hear and review more developed presentations. Accordingly, and for the following reasons, defendant's temporary restraining order application against plaintiff and third-party plaintiffs Summit Actuarial Services and First Actuarial Consulting Team, LLC ("Fact") was granted.

---

[1] In addition to the prayer for declaratory judgment, plaintiff alleges a claim of tortious interference with prospective business relations.

## BACKGROUND

1.   Plaintiff's Complaint

Plaintiff alleges that he was hired by Segal as an actuary in or about July 1998. (Compl. ¶ 4.) At the time of hiring, plaintiff was asked to sign an employment agreement which contained, *inter alia*, a restrictive covenant.[2] Plaintiff declined to sign the agreement. (Compl. ¶ 5.) Notwithstanding this refusal, Segal continued to employ plaintiff, asking him each year between 1998 and 2002 to sign the employment agreement. Plaintiff declined to sign the agreement each time, and this fact notwithstanding, defendant paid plaintiff his base salary and bonus each year. (Compl. ¶¶ 7-8.)

Plaintiff's superior told plaintiff in 2003 that if he did not sign an employment agreement, his 2002 bonus, in the amount of $26,900, would not be paid to him. (Compl. ¶ 9.) Accordingly, plaintiff signed an employment agreement on February 28, 2003 that was back-dated to June 1, 1998 (the "Agreement"). (Compl. ¶ 10.) The Agreement contains, *inter alia*, a restrictive covenant that prohibits plaintiff, during the term of his employment and for three years from the date of termination of his employment, from rendering the types of services performed by Segal or its affiliates to any client of Segal or its affiliates for whom Segal or its affiliates performed, or offered to perform, work at any time during the twelve months preceding plaintiff's termination. (Compl. Ex. A.) On February 25, 2003, plaintiff signed what is termed a "side letter," which states that it was written to address plaintiff's "concern" about whether he could perform services similar to those he performs for Segal to any other clients. The "side

---

[2] Articles 7 and 8 of the Agreement restrict generally plaintiff's ability to (1) disclose certain confidential information and trade secrets that he becomes privy to during the course of his employment and (2) perform certain services for certain Segal clients during the course of his employment and for three years following the termination of his employment. (See Compl. Ex. A.) These provisions are discussed in greater detail herein, and will be referred to collectively as the "restrictive covenant."

2

letter" states that plaintiff may do so, provided the performance of such services does not violate the Agreement. (Compl. Ex. B.)

By letter dated September 28, 2005, plaintiff told Segal that he intended to resign as of December 31, 2005. Segal asked plaintiff to work through January 23, 2006, and plaintiff complied. (Compl. ¶ 17.) On January 23, 2006, Segal wrote a letter to plaintiff stating, *inter alia*, that it had learned that some of its clients intended to terminate their relationships with Segal following plaintiff's termination. In one case, a client had informed Segal that it intended to terminate its relationship with Segal based on plaintiff's advice that he was terminating his employment there. Segal went on to remind plaintiff of his obligations under the Agreement. (Compl. ¶ 18.)

The complaint (1) seeks a declaration that the Agreement, including its restrictive covenant, is invalid and unenforceable and (2) alleges that Segal has tortiously interfered with plaintiff's prospective business relations by advising some of its clients that plaintiff is not permitted to perform services for them pursuant to the Agreement.

II. Defendant's Order to Show Cause and the Preliminary Hearing

Defendant has submitted in support of its order to show cause a declaration from Jonathan Parker, Segal Senior Vice President. (Parker Decl. ¶ 1.) Parker's declaration states, *inter alia*, that Segal maintains certain trade secrets and confidential information, including, but not limited to: "(1) client and potential client information, such as lists of clients and potential clients, contact information for clients and potential clients; (2) client needs, input and history; (3) marketing strategies; (4) project pricing information; and (5) consulting methodologies." (Parker Decl. ¶ 8.) The declaration goes on to state that, during plaintiff's employment with

3

defendant, he was afforded "virtually unfettered access" to such trade secrets and confidential information. (Parker Decl. ¶ 12.)

The declaration then states that defendant learned, in March 2006, that plaintiff, during the term of his employment, had rendered consulting services through an entity named Summit Actuarial Services ("Summit"), to, *inter alia*, Sheet Metal Workers Local Union No. 71 Industry Welfare Fund, a longstanding client of defendant's that plaintiff personally performed work for on behalf of Segal. (Parker Decl. ¶ 13.) Defendant has produced a document prepared by Summit for this union, which names plaintiff's home address as Summit's principal place of business. (Parker Decl. ¶ 13; Parker Decl. Ex. C.)

Prior to his termination, plaintiff informed defendant that several of the clients for whom plaintiff had led the relevant consulting team had told him that they would likely terminate their relationships with defendant upon plaintiff's termination of employment. (Parker Decl. ¶ 15.) Plaintiff asked defendant whether a "financial arrangement" could be arranged to allow plaintiff to immediately permit him to provide services to these clients, but defendant did not respond. (Parker Decl. ¶ 15.) Defendant learned some time thereafter from other clients that plaintiff had informed them of his impending departure from defendant's employ. (Parker Decl. ¶ 16.) Both before and after plaintiff's termination, defendant began to receive termination notices from several of its clients. (Parker Decl. ¶ 18.) Two clients requested that defendant waive the terms of the Agreement's restrictive covenant so that plaintiff could perform services for them. (Parker Decl. ¶ 19.) Defendant argues that this demonstrates plaintiff's acknowledgement of the Agreement's restrictions, as well as his communication to certain clients of its existence. (Parker Decl. ¶ 19.)

4

In response, defendant apprised plaintiff of his continuing obligations under the Agreement in a letter dated January 23, 2006. (Parker Decl. ¶ 19; Parker Decl. Ex. E.) After learning in March 2006 of the work performed by Summit while plaintiff was still employed by Segal, defendant retained outside counsel, who again wrote to plaintiff, by letter dated April 26, 2006, informing him of his continuing obligations under the Agreement. (Parker Decl. ¶ 21; Parker Decl. Ex. F.) Plaintiff and Fact's counsel responded to defendant's letter by an e-mail dated May 4, 2006, claiming that plaintiff had not breached his obligations under the Agreement. Thereafter, the parties began ongoing discussions about the possibility of mediation as a means to resolving the dispute. (Yu Decl. ¶ 4.) Those discussions ceased, and the initial steps leading to this litigation began, when, in June 2006, defendant learned from a client for whom plaintiff had personally provided services while employed by Segal that plaintiff had been soliciting its business. (Parker Decl. ¶ 22.)

## DISCUSSION

I. Temporary Restraining Orders

Federal Rule of Civil Procedure 65(b) allows a litigant to petition a court for the issuance of a temporary restraining order against a party whose imminent conduct will cause an immediate and irreparable injury, loss, or damage to the movant. See Fed. R. Civ. P. 65(b). The Second Circuit has stated that "[t]he purpose of a temporary restraining order is to preserve an existing situation in status quo until the court has an opportunity to pass upon the merits of the demand for a preliminary injunction." Pan Am. World Airways, Inc. v. Flight Eng'rs Int'l Ass'n, PAA Chapter, 306 F.2d 840 842-43 (2d Cir. 1962). A court's determination whether the grant of a temporary restraining order is proper is the same as that used in determining the

propriety of issuing a preliminary injunction. Wenner Media LLC v. N. & Shell N. Am. Ltd., No. 05 Civ. 1286, 2005 WL 323727, at *3 (S.D.N.Y. Feb. 8, 2005). Accordingly,

> [t]he standard in the Second Circuit for injunctive relief clearly calls for a showing of (a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief.

Jackson Dairy, Inc. v. H. P. Hood & Sons, Inc., 596 F.2d 70, 72 (2d Cir. 1979) (per curiam) (footnote omitted). The Second Circuit emphasizes that, in addition to a showing of irreparable injury, a demonstration must be made that the looming harm is not likely to be compensable by damages, and that equitable relief is therefore necessary. See Ticor Title Ins. Co. v. Cohen, 173 F.3d 63, 68 (2d Cir. 1999) ("The basic requirements to obtain injunctive relief have always been a showing of irreparable injury and the inadequacy of legal remedies.").

A. Irreparable Harm

A former employee's breach of a restrictive covenant that results in the employer's loss of a longstanding client is the type of injury suited for equitable relief: "[I]t would be very difficult to calculate monetary damages that would successfully redress the loss of a relationship with a client that would produce an indeterminate amount of business in years to come. Id. at 69; accord Johnson Controls, Inc. v. A.P.T. Critical Sys., Inc., 323 F. Supp. 2d 525, 532 (S.D.N.Y. 2004) (Leisure, J.) ("Generally, when a party violates a non-compete clause, the resulting loss of client relationships and customer good will built up over the years constitutes irreparable harm."); Velo-Bind, Inc. v. Scheck, 485 F. Supp. 102, 109 (S.D.N.Y. 1979) ("By siphoning off plaintiff's carefully gleaned customers, defendants subject plaintiff to a definite possibility of irreparable harm, which increases as long as it continues unrestrained."). Defendant's allegations make clear that this is such a case in which the threat of losing clients is imminent.

6

Indeed, defendant alleges that plaintiff has asked a Segal client that plaintiff be able to issue a response to a request for proposal issued by the client. In such circumstances, the computation of money damages is too difficult, and equitable relief is proper. See Ticor, 173 F.3d at 69.

A movant's demonstration of irreparable harm is strengthened significantly where the employee has previously acknowledged—most often in an employment agreement—that his or her own breach of a restrictive covenant entitles the employer to injunctive relief because of the irreparable injury the movant would incur. Id. (holding that where an employment contract contains a provision conceding that a breach of a non-competition provision will result in irreparable injury compensable by injunctive relief, "[s]uch [a provision], we think, might arguably be viewed as an admission by Cohen that plaintiff will suffer irreparable harm were he to breach the contract's non-compete provision"); see also N. Atl. Instruments, Inc. v. Haber, 188 F.3d 38, 49 (2d Cir. 1999) (finding irreparable harm where the non-movant had "acknowledged in his Employment Agreement that a breach of the confidentiality clause would cause 'irreparable injury' to North Atlantic"). Here, the Agreement states that plaintiff recognizes that a breach of the restrictive covenant would irreparably injure Segal. (Compl. Ex. A.) Consequently, under Second Circuit standards, defendant has made a proper showing of irreparable harm.

B.   Likelihood of Success on the Merits or Sufficiently Serious Questions Going to the Merits of the Claim

Having made an adequate showing of irreparable harm, defendant must now demonstrate "(1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief." Jackson Dairy, Inc. v. H. P. Hood & Sons, Inc., 596

7

F.2d 70, 72 (2d Cir. 1979) (per curiam). In order to make a showing under the first alternative, a movant "'need not show that success is an absolute certainty. He need only make a showing that the probability of his prevailing is better than fifty percent.'" Anacomp, Inc. v. Shell Knob Servs., Inc., No. 93 Civ. 4003, 1994 WL 9681, at *6 (S.D.N.Y. Jan. 10, 1994) (quoting Abdul Wali v. Coughlin, 754 F.2d 1015, 1025 (2d Cir. 1985), overruled on other grounds by O'Lone v. Estate of Shabazz, 482 U.S. 342 (1987)). Indeed, "[t]here may remain considerable room for doubt." Abdul Wali, 754 F.2d at 1025. Defendant argues that plaintiff has, *inter alia*, breached the Agreement by violating its restrictive covenant. Plaintiff first argues on two separate grounds that the Agreement and, more specifically, its restrictive covenant, are enforceable.

1. The Enforceability of the Agreement

The first argument is that, because plaintiff executed the Agreement over five years after he began working for Segal, the benefit of the restrictive covenant to Segal was not supported by any consideration to plaintiff, given that the terms of plaintiff's employment were not otherwise altered. While neither the New York Court of Appeals nor the Second Circuit has weighed in on this issue, New York law[3]—as established by the appellate divisions and applied by, *inter alia*, the Southern District of New York—is clear that, because an employer can terminate an at-will employee without cause at any time, an employer's forbearance of that termination serves as adequate consideration for an employee's agreement to a restrictive covenant. See Int'l Paper Co. v. Suwyn, 951 F. Supp. 2d 445, 448 (S.D.N.Y. 1997) ("'[B]ecause in an at-will employment the employer has the right to discharge the employee . . . without cause, and without being subject to inquiry as to his motives . . . forbearance of that right is a legal detriment which can stand as consideration for a restrictive covenant.'" (quoting Zellner v. Conrad, 589 N.Y.S.2d

---

[3] The Agreement's governing law provision calls for the application of New York law to govern its terms. Such law will therefore be applied. See, e.g., Int'l Minerals & Res., S.A. v. Pappas, 96 F.3d 586, 592 (2d Cir. 1996).

8

903, 906 (App. Div. 1992))). Further, "where . . . a relationship continues for a substantial period after the covenant is given, the forbearance is real, not illusory, and the consideration given for the promise is validated." Zellner, 589 N.Y.S.2d at 907. As noted, the decision of the Appellate Division, Second Department, in Zellner has been followed by other courts. See Ikon Office Solutions, Inc. v. Leichtnam, No. 02 Civ. 0721, 2003 WL 251954, at *2 n.7 (W.D.N.Y. Jan. 3, 2003); Gazzola-Kraenzlin v. Westchester Med. Group, P.C., 782 N.Y.S.2d 115, 117 (App. Div. 2004). This argument thus fails.

Plaintiff's second argument is that the Agreement is unenforceable because plaintiff would not have entered into it but for the economic duress he endured as a result of Segal's threat to not pay his 2002 bonus. Plaintiff is foreclosed from raising this argument. As Judge Friendly stated, "under New York law a contract entered into under duress is generally considered not void, but merely voidable, and one who would repudiate a contract procured by duress must act promptly or will be deemed to have elected to affirm it." Scientific Holding Co. v. Plessey Inc., 510 F.2d 15, 23 (2d Cir. 1974) (Friendly, J.); accord Int'l Halliwell Mines, Ltd. v. Cont'l Copper & Steel Indus., Inc., 544 F.2d 105, 108 (2d Cir. 1976) ("The burden necessarily increases proportionately with the delay in initiating suit or otherwise repudiating the contract in question, since it is well established under New York law that a party asserting duress must do so promptly."). The Second Circuit has further elaborated on this doctrine:

> If the releasing party does not promptly repudiate the contract or release, he will be deemed to have ratified it. A party may ratify a contract or release entered into under duress by "intentionally accepting benefits under the contract," by "remaining silent or acquiescing in the contract for a period of time after he has the opportunity to avoid it," or by "acting upon it, performing under it, or affirmatively acknowledging it."

VKK Corp. v. Nat'l Football League, 244 F.3d 114, 122-23 (2d Cir. 2001) (quoting In re Boston Shipyard Corp., 886 F.2d 451, 455 (1st Cir. 1989)). Here, plaintiff remained in Segal's employ

9

for over two and one-half years after entering into the Agreement. His argument that the Agreement is unenforceable because it was only entered into because of the economic duress applied by defendant is thus foreclosed.

2. The Reasonableness of the Restrictive Covenant

Plaintiff argues in the alternative that if the restrictive covenant is enforceable, defendant's request for a temporary restraining order should still be denied on the ground that it is both overbroad in its temporal and geographic scope, and that its enforcement is unnecessary to prevent the disclosure or use of Segal's trade secrets or confidential information. (Compl. ¶¶ 24-25.)

Under New York law, "'a restrictive covenant will only be subject to specific enforcement to the extent that it is reasonable in time and area, necessary to protect the employer's legitimate interests, not harmful to the general public and not unreasonably burdensome to the employee.'" BDO Seidman v. Hirshberg, 712 N.E.2d 1220, 1223 (N.Y. 1999) (quoting Reed, Roberts Assocs., Inc. v. Strauman, 353 N.E.2d 590, 593 (N.Y. 1976)). Restrictive covenants may be used by employers "(1) to prevent an employee's solicitation or disclosure of trade secrets, (2) to prevent an employee's release of confidential information regarding the employer's customers, or (3) in those cases where the employee's services to the employer are deemed special or unique." Ticor Title Ins. Co. v. Cohen, 173 F.3d 63, 70 (2d Cir. 1999) (Cardamone, J.); BDO Seidman, 712 N.E.2d at 1223. This is a fact-specific inquiry. Ticor, 173 F.3d at 70; BDO Seidman, 712 N.E.2d at 1224. The subject covenant restricts plaintiff's performance of similar services, for a period of three years following his termination, to any client of Segal or its affiliates for whom Segal or its affiliates performed, or offered to perform, services in the year preceding plaintiff's termination.

10

Case law makes clear that, given New York's strong public policy against restricting one's ability to make a living in the profession of his or her choice, restrictive covenants are generally disfavored. See, e.g., Columbia Ribbon & Carbon Mfg. Co. v. A-1-A Corp., 369 N.E.2d 4, 6 (N.Y. 1977) ("[R]estrictive covenants which tend to prevent an employee from pursuing a similar vocation after termination of employment are disfavored by the law."). However, an employer's right to foreclose the *unfair* competition of a former employee is permissible. BDO Seidman, 712 N.E.2d at 1224. Here, defendant's interest lies in its desire to guard against plaintiff's disclosure of its confidential and/or trade secret information in the course of performing competing services. This information consists of "(1) client and potential client information, such as lists of clients and potential lists, contact information for clients and potential clients; (2) client needs, input and history; (3) marketing strategies; (4) project pricing information; and (5) consulting methodologies." (Def.'s Mem. Law Supp. Mot. 13.) Defendant submits in the Parker declaration that plaintiff "was afforded with virtually unfettered access" to such information while employed by Segal. (Parker Decl. ¶ 12.) Plaintiff's "unfettered access" to all of defendant's confidential information, when coupled with the fact that certain clients of defendant have either terminated their relationships with defendant, or, even worse, affirmatively asked defendant to waive any restrictions it has in place with defendant so that he may perform services for them, leads the Court to believe that, at this stage of this litigation, enforcement of the restrictive covenant is necessary to ensure the integrity of its confidential information and/or trade secrets. On the present record, defendant is seeking solely to forestall plaintiff's *unfair* competition, and not enjoin him from *fairly* competing by, for instance, working for a competitor of defendant's. See id.

Similarly, the Court finds that the geographical and temporal scope of the restrictive covenant, on the present record, is adequately reasonable. First, restrictive covenants lasting for three years or longer after an employee's termination have been enforced by New York courts. See, e.g., Novendstern v. Mount Kisco Med. Group, 576 N.Y.S.2d 329, 330-31 (App. Div. 1991) (three years); Bates Chevrolet Corp. v. Haven Chevrolet, Inc., 213 N.Y.S.2d 577, 581 (App. Div. 1961) (five years). Second, the New York Court of Appeals has refrained from invalidating entirely covenants with a similar geographical reach by instead enforcing the covenants to a narrower universe of clients. See BDO Seidman, 712 N.E.2d at 1225. For instance, a court may reform a restrictive covenant such that the employee is only barred from performing services for clients for whom the ex-employee *personally* performed services for while employed by his former employer. See id. While the Court may find that a similar reformation is appropriate after reviewing a more developed evidentiary record, the Court finds that, on the present record, the subject covenant is adequately reasonable given defendant's claim that plaintiff had "unfettered access" to *all* of defendant's confidential information, which would enable him to solicit any and all of Segal's clientele.

In sum, while the Court is not in an appropriate posture to conclude that plaintiff has made a showing of its *likelihood* of success on the merits, it has "sufficiently [shown] serious questions going to the merits to make them a fair ground for litigation." Jackson Dairy, Inc. v. H. P. Hood & Sons, Inc., 596 F.2d 70, 72 (2d Cir. 1979) (per curiam). Further, when balancing the potential hardships to the parties resulting from the grant of this temporary restraining order, the Court believes that the maintenance of the status quo is appropriate given plaintiff's potentially imminent solicitation of work from longstanding Segal clients. See id. Indeed, the IATSE National Pension Fund, who plaintiff served as a consultant to while at Segal, has

12

informed defendant that it was contacted by plaintiff in order to respond to a request for proposal that IATSE has recently issued. (Parker Decl. ¶ 22.) Such solicitation, compounded with the other indications of solicitation proffered by defendant, evidence a hardship to defendant that is of a greater severity than that imposed on plaintiff. Because plaintiff will only be restrained for a short while until the Court can review a more developed factual record after the preliminary injunction hearing, neither the plaintiff nor the "general public" will be unduly harmed. See BDO Seidman v. Hirschberg, 712 N.E.2d 1220, 1223 (N.Y. 1999).

## CONCLUSION

For the foregoing reasons, the Court granted defendant's application for a temporary restraining order, enjoining and restraining plaintiff from violating articles seven and eight of the Agreement, which prohibit plaintiff from, *inter alia*, directly or indirectly, disclosing or using any of defendant's confidential information and/or trade secrets as defined therein; directly or indirectly contacting or soliciting the trade of Segal's clients as limited therein; and, directly or indirectly, rendering services of the kind rendered by defendant to any person or entity for which defendant had rendered, or offered to render, services during the twelve months preceding the termination of plaintiff's employment.[4] As stated above, the Court's findings are preliminary in nature and subject to change after the Court conducts a preliminary injunction hearing in which the Court will be able to review an enlarged evidentiary record. The parties are ORDERED to appear before this Court at 500 Pearl Street, Courtroom 18b for a preliminary injunction hearing on July 6, 2006 at 10:00 a.m.

**SO ORDERED.**
**New York, New York**

June **26**, 2006

_____
U.S.D.J.

---

[4] Because article 10 of the Agreement states that defendant will not be required to post any security or bond in the event it seeks injunctive relief from a court, no such security or bond is required by this Court.

14

Copies of this Opinion and Order have been mailed to:

David G. Ebert, Esq.
Ingram Yuzek Gainen Carroll & Bertolotti, LLLP
250 Park Avenue
New York, New York 10177

James S. Yu, Esq.
Seyfarth Shaw LLP
1270 Avenue of the Americas
Suite 2500
New York, New York 10020-1801
James S. Yu, Esq.